on behalf of the F1 Cross Athlete, Mr. Timothy Elliott, on behalf of the Athlete Cross Apparel, Mr. E. William Williams. Mr. Elliott. And while Mr. Elliott is stepping up, we have granted additional time, the court is now aware of that time, and it will be sent accordingly. So, you may proceed. Thank you, Your Honor. May I please report, uh, Timothy Elliott on behalf of Stratford Medical Center. This is a reformation case, and the circuit court below properly reforms the lease in this case. And you asked for that, correct? And we asked for that. And I guess I should point out at the beginning that when this appeal was filed, there were three groups of defendants at issue, and we're now down to one. The only remaining, uh, defendant in the case is Dr. Morgenstein, and his practice group, Dr. Zuckerman and Miller, have settled. Um, we asked for reformation, the circuit court granted reformation. Where the circuit court erred is that it stopped there. Under the terms of the party's lease, once the circuit court reformed the lease, it was required to award fees and interest to Stratford Medical Center. But fees and interest, well, let's talk about interest. Interest was pursuant to a breach of contract, correct? Interest is any unpaid rent. You do not need to show a breach to get it. Interest under the contract, paragraph 35, is on any unpaid rent. What's the standard of review for interest in a relief that's granted in equity? What's the standard of review? Um, the standard of review where interest is granted in equity is to know it is part of his abuse of discretion. But that's not what the circuit court did here. It is relief in equity. It is relief in equity, but the interest and the attorney's fees are both required by the statute. And the case law is very clear in saying that where you have a part of that statute by the contract, that where you have an express contractual provision, a circuit court cannot use equity to trump or change the contractual provisions. Here, the contract says that interest is required upon unpaid rent. The court does not have equitable discretion to disregard that or to change that or to say I choose not to enforce that provision in this case. The principal case... What's the unpaid rent under the lease? The unpaid rent under the lease is the amount between $16.50 a square foot, which is what Dr. Morgensen had been paying beginning at the lease inception in 2006, and the $27.71 a square foot that he was required to pay under the party's agreement. But the lease is what we're talking about now. That is correct. We are talking about the lease. Does the lease anywhere talk about the $11.21 to be used for operating expenses and real estate taxes? It does. Where? If you look at paragraph F on the lease, and that's the number of the mistake. I believe it's page 61 of our appendix, draft independent. The big one? The big one. Several people in the courthouse this morning commented that we've killed a lot of trees on this case, and they're certainly correct. The thing we have is electronic records. Did you say 21? I said page 61. And let me take a step back, because I think because this is the nub of the reformation right here, it's helpful, I think, to take a step back. What the evidence showed, and it was clearly convincing evidence, as Judge Polk showed out, was that in October of 2005, the parties had reached an agreement, Dr. Morgensen had agreed, and Dr. Morgensen admitted at trial that he had agreed to pay rent of $27.71 a square foot. That consisted of two components, a $16.50 base component and an $11.21 camp component. That was a fixed camp component. It didn't float up and down depending on what the actual camp cost. It was fixed. Dr. Morgensen admitted that he agreed to pay both of those amounts in October of 2005. There's no question that we have those. Don't back up that far. Show me in particular the lease. If you look at the summary of the lease provisions, and this is the first page, it has paragraphs F and G, and these are the two paragraphs that were reformed by Judge Polk to it. Paragraph F defines a base rent as to which an escalator is applied. The escalator here is 3% a year. Paragraph G talks about the $11.21 per rentable square foot. I think that's H. I'm sorry, you're correct. It's H. The error in this case was that there shouldn't have been an additional sentence on paragraph F and some changes in the language to reflect the fact that Dr. Morgensen had agreed to pay both the $16.50 and the $1.29. Here's the simple logic that I'm struggling with. Did the defendants pay the amount that was due under the lease? Forget about what went up to it. Did they pay the amount that was specified in the lease? The defendants paid the amount that was specified in the written lease. But on the form of this. So is there any evidence that they did not pay the amount after the trial court reformed the lease? I mean, is there any indication? They were paying up to the amount on the lease. It was clear there was a mutual mistake at that. The trial court found that. So, as you've been alluding to, where did the defendants not comply with the lease? They were saying, hey, you asked for this amount on the lease. That's what we paid. That's exactly correct. And to go a step further and answer your other question, upon the reformation, the defendants entered a check for the difference between the $16.50 and the $27.71. Our point is, I guess, the following. The court found that the lease did not reflect the party's agreement, and the court reformed the lease. We are not seeking to enforce the erroneous written lease. What we're seeking to enforce is the correct lease, the reformed lease, the party's actual agreement. And our point is that they did honor the actual agreement that the court found existed back in 2006. So the unpaid rent arises from their failure to pay according to the reformed lease. And under the reformed lease, we were deprived the time value of that additional rent, the $11.21 per square foot, for two years or so, until the court entered judgment in 2010. And the case law that supports that was that the interest loan before the reformation should be given. Yeah. I do not believe we have a statute specifically awarding interest prior to that. I would like to check with you. Wait. Are they strong for proving? I'm sorry. No. But what we do have is a case law that says reformation is retroactive. Reformation dates back to the date of the original agreement. And the contract is enforceable as the original agreement back to that date. So in this particular case, what the judge found, Judge Folkman found, was that the parties had an agreement to pay $27.71. And that that agreement was known to everybody. And that they paid only $16.50, knowing that they had an agreement back to that date. We believe we are entitled to enforce the reformed lease and recovering interest. We were deprived of that time-valued money, as I said, for a period of two to four years. But this agreement that takes various forms, including the contract for sale, minutes in the minutes of a meeting, and a meeting where they presented the agreement, then the minutes of that meeting that reflected the agreement, and then the contract for sale, which generally talks about the rents as well. In any of those three places, the issue of prejudgment interest? Yes, ma'am. If you walk through, beginning with the positive negotiations, which is essentially June or July of 2005, up through the execution of the final leases in June of 2006, there's no express discussion of interest. However, the evidence showed that at the October meetings where Dr. Morgenstein agreed to the rental rate, he also asked that the rest of the lease comply with the 1993 lease. Remember, at the time they were having these negotiations, Dr. Morgenstein had been a tenant of this building for 12 years. He had a preexisting lease that had prejudgment interest provisions, attorneys' fees provisions, and the like. But that was with another entity. That's correct. But what the evidence showed is that when he agreed to the rental rate of $27.71, he also said, I want the rest of the terms to be as they are in my existing lease. That would include the prejudgment interest rate. So there is, you're correct, there's no express discussion of interest. Yeah. The court's relief is inequity. Do you have a case that says where there's a lease reformed that prejudgment interest must be awarded, even if a contract, whether a contract says it or does not say it? I do not believe we do. There is no case that says that. I'm not familiar with that case. I'm also not familiar with a case that says the opposite. What I can fall back on is the general rule that says you cannot use equitable principles to supply the terms of a contract. Again, it was your client's complaint and sought relief in equity. Correct. Do you have a case that says you can be granted both relief in equity and at law on the same count? Because the interest and the relief under the contract would be for if there was a finding of a breach. There was no finding of a breach. Correct? I do not have a case from Illinois on that. We've cited the Phil Branson case from Arizona, which we think is on all fours with this. And in that particular case, the issue was very, very similar. In that particular case, once the lease was reformed, fees, and I believe interest, certainly fees were allowed under the terms of the contract. We certainly sought equitable relief in reforming one provision of the contract. But that does not create a situation where the court is then free to tinker with all the other terms of the contract. There was no dispute with respect to all the other terms. The parties agreed that the interest provisions, the fee provisions, everything else were proper. So once the court is done reforming the one provision that was an error, we don't believe the court can then go further and begin making equitable changes to the other provisions. There is some limitation on the court's power to have it submitted. Have I answered your question on the interest issue? Well, the fact that you couldn't find any cases, is that why your basic argument on this issue is probably the, I mean, it's at the end, and it's the shortest, and it only has two cases cited, and they basically go to how we review it? So we're just kind of, we'll make this up as we go? Well, it's a matter of contract interpretation, so subject to de novo review. And I think the Tri-G case is pretty on point. That's actually a case that our opponents cited, and in Tri-G, what the Supreme Court has mentioned. You didn't cite that in your interest argument. I believe we cited it in our reply in response to their implication of it. Tri-G says interest is not recoverable absent statutory agreement, and then goes on to say an exception to the rule exists in equity. The rule is discretionary in equity, and this was an equitable relief that was granted in your case. That's exactly correct, but we have a contract in that case. What it says is, in the absence of a contract or a statute that permits interest, both of which would give legal grounds for the awarding of interest, a chancery court can then fall back on equitable considerations. In our view, the court never reaches that third prong because we do have a legal basis on which we can recover interest, which is the contract. With respect to fees, I'm shifting over to fees. If I may, I'm happy to answer any other questions you have in interest. With respect to fees, the circuit court's judgment, the circuit court's opinion, reason for denial is a little bit different. In that particular case, the circuit court found that fees would not be awarded, not through equitable considerations, but based on a contract interpretation. What the circuit court found was that this was not an action to enforce a contract. That's a legal determination subject to de novo review, and we believe that it is wrong. First of all, we've cited case law for you saying that reformation is, by its nature of action, to enforce a contract. The Phillips case, the Swan case, the State Farm v. Hanson case, and the McConnell case from Oregon. There's been no contrary case law authority cited by Dr. Morgenstien. It's pretty well settled and normally a lot of their reclamation is an action to enforce a contract. That's the general rule and it applies to the great force here. Why? We said the contract should have called for $27 in rent payments. They disagreed. They demanded that we receive a rent deficiency for the past several years. They refused to pay. In this action, the court compelled them to accept our interpretation of the agreement and to pay the minus. That's enforcement. That is compelling them to obey to a reformed instrument, and for that reason we believe the circuit court wasn't there. In the reply brief- What's the actual language of the section concerning fees? There's not a prevailing party notation in there. It's paragraph 35 of the release, and if you give me just a moment, I will give you a copy. Thirty-five. I'll read that out. It's on page 88 of the record of our appendix. If a party to a lease is made a party to a lawsuit without fault on its part. We're looking at the second sentence of that, which says that the tenant shall also pay, the tenant here is Dr. Morgenstern, all cost, expense, and reasonable terms fees that may be paid or incurred by landlord in enforcing tenant's covenants and agreements in this lease. Well, if we have a mutual mistake, unless you want to give up that argument, if we have a mutual mistake, why should the Morgenstern group pay your client for a mistake that it also made? The mutual mistake was solely in the drafting of the contract. That's a pretty big mistake, considering that's what everybody was going to live by. It was a significant mistake. And your client or someone on behalf of your client drafted that. That's correct. The mutual mistake was in the drafting of the agreement. But what the circuit court found, and the evidence clearly supported, was the fact that both parties knew and understood that the agreement was $27.71. Again, there's no dispute at trial. Dr. Morgenstern testified that he knew full well that that was the rate. In this particular instance, we're entitled to enforce this because what we're trying to enforce is the actual agreement that the parties made back in 2006. My client had to go through several years of litigation expense because Dr. Morgenstern was trying to enforce an agreement that at trial he acknowledged was not correct. At trial he acknowledged it. He agreed to pay $27.71. But not by the doctor. He said that from the contract, the sale of the building, that was the amount. But it wasn't the lease. Oh, no. He testified very clearly that he understood his lease obligation was going to be $27.71, and that he understood that in October of 2005, and he also understood that was going to be his obligation the day he signed this, June 30th. The testimony is clear. He signed it before he came up. He didn't pay $16.50 after all. He knew what it was. He knew what it was. He's a lawyer. He's a doctor. He's a doctor, but here's what happened on that. The reason he began paying $16.50 is because the management company began sending out invoices, and the invoice amount was based on the $16.50. So he paid the invoice amounts that came out in the first couple months. And when the amended notices came out with the amended invoices, his attorney said, we're in compliance with the lease. Thank you. That's exactly correct. But I will go back to what I said before. That's what his attorney said. Dr. Morgan Steve always knew that he had agreed to pay $27.71. And an interesting thing, if you look through his testimony in this case, there's not a single place that Dr. Morgan Steve ever says, I thought I was supposed to pay $16.50. You would think in a reformation case that the defendant would actually say, gosh, I was under an honest belief that it was $16.50. He never did that. What he said was, I always knew it was $27.71. The contemporaries document showed that. And it would be the height of inequity to allow him to cause us to go through so much cost and expense and delay to establish an agreement that he admitted he knew was the agreement all along. Under this provision, we are entitled to fees for reinforcing the agreement. And the agreement here was to pay $27.71. I don't think there's any dispute about that. Did you ask in your complaint, do you allege fraud? We don't. We allege a mutual mistake. Well, what you're saying now is he knew and he chose not to pay. Maybe on advice of counsel, maybe otherwise. So, you know, if he knows it's a mistake and he's not paying it, why didn't you bring it on account? We cannot establish fraud on that. We just didn't have the evidence to do it. This is clearly a mutual mistake. We went with what we believed and I think the evidence showed was the correct thing that happened. The wrong term was put in the lease. It was circulated. Nobody ever noticed it. After the leases were signed, a couple months later, we noticed it. We brought it to his attention and he said that's tough. It might have been advice of counsel. I don't know that. I don't think there's really any evidence on the record. The evidence that's on the record is very clear, though, that nobody ever caught this mistake. There's not a single scrap of paper anywhere that says, you know, hey, I just noticed it says $16.50 and I think that's what I'm agreeing to pay. It just doesn't exist in this record. My point is simply on a breach of contract account and a contract action, state of mind is generally not an issue. Breaches of contract are strict. In this particular instance, we were trying to enforce an agreement that he had clearly made. We had to spend a significant amount of money getting his case to a position where we could get him on the stand at trial and have him admit, yeah, I agree to pay $27.75. Can you clarify your position on philosophical extension? Once you have a negotiated amount, it doesn't matter what happens after that. It doesn't. It can't be that you collect on this argument theory of interest. You're saying he agreed to this or he didn't agree to this. It doesn't matter what happens after that. It doesn't matter what the lease says. It doesn't matter what he's doing after that. We win as a matter of law. Is that your position? I'm not sure. Are you talking about the fee issue? You're saying that he agreed to pay this up front. It doesn't matter that the lease contains a mistake. It doesn't matter who drafted the lease. We're entitled to interest and fees from day one. Is that your position? That's our position. Let me take a step back and address what I think is the broader question you're asking. There's clearly a course of negotiations here. It began in June of 2005 and terminated on the execution of the lease in June of 2006. As the plaintiff in a reformation action, our burden, and it's a high burden, because it has to be clear to missing evidence, our burden is to show that at some point along that way in negotiation, there was an agreement on this term. Right. Which I think we showed. And that that agreement was supposed to be baked into the written contract and wasn't. So then why did everything fall into Dr. Morgan's hands? Again, you're dodging my question. You're saying that once he agreed defensively to this price, whatever happened after that is irrelevant. For purposes of the fee issue, I will agree with you. Because every provision in this contract, this contract is the result of long-period negotiations. This is the party's final agreement. Everything, you know, they can't say, well, we don't have to pay fees because, you know, we didn't agree because they agreed to the fee-shifting provision. So my point is, really, once the judge at the circuit court level finds that the real agreement was to pay $2,771 and that that should have been reflected in this lease, then they have to pay attorney's fees. Yes, that is my position. It is an action to enforce the lease, and it's a successful action to enforce the lease. We'll parse some words over. At what point is there the obligation to pay the interest from the time the contract is reformed or from the beginning? You're saying it's from the beginning, but it doesn't matter what happens afterwards. I think you'd agree on that much earlier. Correct. Right. I agree with your interpretation. This is not an issue. Right. In fundamental, I think it has to be because the case law is very clear in saying reformation has to date back to the time of the agreement. When you reform an agreement, you're not saying we're amending it going forward based on changed circumstances or a possibility or anything like that. When you reform an agreement, you're saying, hey, way back when, this is what they actually agreed to. And so it has to, by its nature, be retroactive in application back to then. The other thing that would happen is if you did not have reformation be retroactive, you would create a situation where it would be to the advantage of a defendant to drag litigation out. It would be arbitrary because the date of effectiveness of the reformation would be whatever date you finished with trial or summary judgment or appeals or whatever. That would be arbitrary. In this particular instance, with a seven-year lease, I mean, my gosh, we're five years into it. If this case were to go on for another six months or a year, the whole thing could be over. Does the fact that your side didn't discover this mistake or do anything about it for a period of time bear out of the trial court's discretion? No, because we don't believe it was discretionary. We believe that both with the fee issue and the interest issue, it comes out of the contract and so isn't based on equitable considerations. Now, there is room in the fee analysis for equitable considerations. The court can make a determination as to who's a prevailing party. There's some discretion in that. The case law is pretty clear on that. The court can also, if fees are going to be awarded, give equitable considerations as to reasonableness, rates, all that sort of stuff. The one I showed in the stomach earlier, is that not part of the case? Correct. That can come into the reasonableness of a fee award. But on the sole question that the circuit court reached, which is, does the contract permit fees in this instance, that's a matter of law and that's where the circuit court erred. Because what the circuit court said is, a reformation count is not a count to enforce a lease. And that's just squarely inconsistent with Illinois law. Was there ever an attempt to renegotiate after the tenants initially were just paying the base amount? There was an attempt to renegotiate. I hesitate to go too deep into that because I'm not sure how much of it is actually in the record of trial. But I do think the record of trial substantiated the fact that there were discussions. There were seven tenants in the building. Four of them signed the new leases. These three said no. There were discussions. They didn't go anywhere. And that's why five years later, we're before your honors. I don't want to worry about time. You're past it. You'll have an opportunity if you choose so after Mr. Maloney. Thank you. Thank you. Thank you. May it please the court, counsel, William Maloney on behalf of Dr. Stuart Morgenstein, Dr. Brian J. Kemper, and the corporate entity. I'll try initially to respond to the arguments regarding plea claims. I think the distinction that counsel fails to note, and the one that's controlling here, is that the noble review of attorney's fees only comes about if there's really no dispute as to the facts upon which a trial court judge applies the fee clause. Here, there were numerous contested issues of fact which caused the trial court to exercise discretion. So you believe this is an abuse of discretion? Absolutely. Even though if they ask them and your client admits at trial that I won, there might have been a mistake about this, but the rest of it should have been like my old case, which provided for fees as well as pre-judgment interest. Well, yes, if you look at the precise language, and I'm glad you did ask Mr. Elliott to recite it to you, it talks about fees for, quote, incurred in enforcing covenants and agreements in this lease. Not outside the lease, not from the state, not for extrinsic evidence which the parties may dispute, but in this lease. Counsel tries to persuade the court that an Arizona decision by Anderson should be controlling here. I don't think we have to look to Arizona when we have second district controlling authority on the subject. Towers versus Rockford, stop and go. It is right on the money. It holds that the reviewing standard is abuse of discretion. Of course, that was a prevailing party case, in essence, because I remember that. Okay. I think I wrote that down. In this particular case, there was a great deal of contest here as to who was the cause of the error. Keep in mind, it's the defendant's position that the cause of the error was Dr. Choms' driving frugality in this case, her refusal to hire attorneys during numerous successive critical points in the presentation of this proposal. No attorney to prepare a letter of intent. No attorney to prepare a purchase proposal. No attorney at the meetings in October 17 and October 28 with the doctors. No attorney to prepare a $6.5 million contract. She relies on Joe Daniel. Let me ask you this. Your client had been a tenant for many years with the 93 lease, and that fee provision never changed. It was always in there, correct? That is true, yes. So your client was always aware of that. The issue, the fact issue, is whether or not she should be held responsible or that she's at fault for the litigation, correct? That's the fact issue. So I want you to focus on that. That's the issue. What happens once your client is notified that there was a mistake, that the lease should have called for $27 as opposed to $16.50? What about that? Be mindful of the fact that Dr. Morgenstein didn't want the lease at $16.50 or $27.50. They were strong-armed in deciding this thing under the penalty of draconian financial circumstances. Here we have a lease that's at $32 a square foot. It's got a dividend factor that generates a million dollars worth of pension. But that's not really part of this litigation. The partnership that he was once part of sold this building to Dr. Johns. Yes. Dr. Morgenstein was an investor in a land of equity. That's not the issue that's before us. The issue that's before us is basically the lease. We can look at maybe that other document to see what was in that document, but we're not reforming that document. We're reforming a lease. That is correct, yes. Okay. So when he was strong-armed, if he was strong-armed, it was in the other agreement, the contract to sell the building, not this particular lease. We believe he was strong-armed in deciding this lease because there was no non-compete clause. Keep in mind, these doctors with their specialties are very dependent on the CDH, Center DuPage Urgent Care Facility to refer them to business, particularly Dr. Morgenstein and Kemper being old-timer endologists, if I did that right the first time. They're very dependent on referrals, and their business practices could be destroyed without non-compete clauses. Dr. Morgenstein. But the thing is about a lease. They couldn't go to another building and find a place to lease? They absolutely couldn't move at all. Every doctor was asked the question, were you given the option, the opportunity to vacate the premises? No was the answer. The only thing Dr. Chott would do, either sign the lease as I had prepared it or suffer the consequences of having the preexisting lease assigned to me. No one ever had within their contemplation that the dividend generating factor of the 1993 leases would be conferred to the new buyer. Keep in mind also, these 1993 leases had a built-in amortized factor for the build-out costs which the doctors had to finance. Anything in excess of $35 a square foot was also built into the lease. Nobody ever said to the purchaser here, and I might add the purchaser was AC Investment, never struck or did even insist on these negotiations for going on in October, and there was no evidence of an assignment of the lease. But nobody ever said that this was a market rent, great rent. I mean, it just didn't happen. So the fact that these parties were basically strong-armed into signing this document with no ability to leave the building and an absolute refusal by Dr. Chott to sit down and negotiate. I mean, you saw all the e-mails and the correspondence. She wanted a lot more rent. As I read part of the record, she was looking for more than $2,771. She would have wanted $3,500 or $4,500, and she wanted longer leases. She came down in hopes, didn't she? I never saw any indication that she wanted more than $2,771. I think the evidence suggests that Dr. Morgan seemed to suspect that she was looking for $2,771. But I think the most powerful theme was at the meeting where she and Mr. Vandermolen actually presented what she was looking for, correct? Yes, the two meetings were October 17 and October 28. I submit to you that there's only one contemporaneous writing that details what occurred in that meeting, and that was Joe Daniels' e-mail to his superior at CDH, Michael Rivota. This is Exhibit 11. Joe Daniels, on October 27, the day before the second meeting, tells his superior, this is a modified gross lease with a stop at $1,121 per rentable square foot. This amount is based on the current cost of the operating expenses and the real estate tax. The landlord pays the first $1,121, the base year, and the tenant pays the amount over the $1,121 per rentable square foot. This might as well be a tape recording of what was presented. And all I'm telling you here is whatever the doctor suspected that she meant, the letters of intent were wrong. The pitch on October 17 was wrong. The next day, when Joe Daniels went to the October 28 meeting, did he indicate there was any error? Did he say, hey, wait a minute, I'm experienced in leasing. I have to set you guys straight. There was a major mistake here. No, he perpetuated the mistake by drafting the contract. All right, let's segue into another substantive, fundamental, overarching question here. I believe you're arguing that the trial court has judged this contract in a manifest way because this was a legal error mistake. Did I make a mistake? Is that what you're arguing? Yes. Before any purchaser, before any tenant, before any doctor or tenant got involved, you see Vander Molen, again, this is Dr. Chong's gratis advisor, sending out letters of intent reciting that they'll have the same stops as the preexisting lease. Every doctor or tenant who lived there, they had a stop in their 1993 lease. Landlord paid the first portion, which was called the stop. Tenant paid the excess. Nobody ever used the term pass-through. It should have been an 1121 pass-through. We have your client's testimony that what he said he always expected and he understood. He suspected she was looking for 2771. Yes. But, but, but Dr. Mullen, he was also expecting terms and conditions with the lease to be negotiated. He was expecting that attorneys would prepare the leases. He was expecting that he would be bound when a written document was signed. Didn't he testify that when he signed the lease, he thought he was agreeing to 2771? Didn't he testify to that? He did. I think he did. But yet he didn't pay 2771. He didn't pay 2771. But I'd advise a counsel. Well, that's true. But also, how about section 35E and F in the lease? 35E says the lease is the only agreement between the parties. 35F says nothing said, done, or represented prior to the signing of the lease shall bind the landlord unless and until the lease is signed, executed, and delivered. Does this mean nothing? No. I'm glad that the interpretation is a unilateral mistake. A mutual mistake under the case law exists when the parties are in an actual agreement, but the instrument to be reformed for the lease in its present form does not express the parties' real intent. You seem to be saying that Dr. Chong, or somebody I've heard of, ultimately asserted the wrong amount. It can't be a mutual mistake. How can that be? What could be more compelling than the e-mail that Dr. Chong sent to her own attorneys? I feel sadness and abandonment. You blame me entirely for the mess. What could be more compelling in terms of unilateral mistake? The trial court ruling. You're challenging here that the trial court ruling is not supported by the manifest way of the evidence. Correct? That's your argument. Unilateral? Your client, again, testified that when he signed the lease, he thought he was agreeing to 2771. How is that not a mutual mistake? I think the way of evidence suggests that the absence of any participation by Dr. Morgenstein in the lease preparation, he contributed nothing. You seem to be saying whoever the last scrutineer is, it turns on who actually inserts the document, utensils in the amount. It doesn't matter whether the other side has agreed to the amount or not. I don't think the case law, if you'd like to support your analysis, but it hinges on who is the most culpable person or the last one to insert the figure. Morgenstein, I think it's clear, and I think the record you've conceded this, knew and was expecting to pay the $27 figure. It didn't make it into the lease. How could that not be a mutual mistake? Because Pong puts in the wrong amount? Well, because the tenants were barred from any meaningful arms-length negotiation in drafting or crafting the lease. We would also submit to the court that this is a mistake of law. This is not a mistake of fact. This is a mistake because Dr. Chong did not understand the legal effect of the words freely chosen by her. She did not understand that an 1121 stop obligates her. We've cited several decisions. Handelsman, 2nd District Authority, quote, A scrivener's error or clerical error is one resultant from a minor mistake or inadvertence in writing or copying something or the record and not from a decisional or judgmental determination, quote, from case 1135 of that decision. I think here we do not have a mistake of fact. We have a judgmental or a decisional mistake here. It's a mistake because we need a mistake of fact to reform, not a mistake of law. And in the contract that constituted the sale of the property in exited fee, immediately next to Dr. Morgenstein's name is, if it's a 7-year lease, it's $27.71. If it's a 10-year lease, it's $26.21. That's what the partnership that he was a party to agreed to if he was going to stay in this building. So we only look back to this to get the facts, and that's a fact that's rather critical here. Well, that brings me to my next point. Do we have a binding antecedent agreement here upon which reformation can be based? As of October 28, we have two meetings. We have two meetings in which there are proposals discussed, and there's testimony that there's agreement. Basically, the parties are negotiating. There's agreement to move forward with the deal premised upon a $6.5 million purchase. But don't the clauses in 35E and 35F negate that this can be a binding agreement? Don't they mean that it is a condition precedence that a lease be executed before there's anything binding? Doesn't the statute of frauds here mean anything? We have two provisions in the statute of frauds that would prevent this antecedent agreement from being binding in any manner. Well, a lease was executed. A lease was executed, correct. And then ultimately reformed. Because the court, this is everything that ‑‑ I assume everything that you're presenting to us, and he decided there was a mutual mistake of fact. Well, and we're asking this court, particularly if you look at the Chivarelli decision, which we think is controlling here, and the Busses decision. Chivarelli, there was never any presentation to the CTA board, so there was never any agreement. That's why reformation was wrong. There was an agreement, but there was no board approval by the CTA. Here, of course, we have clauses 35E and 35F, which says as a condition precedence, a lease must be signed and executed before anything prior can be binding. And that's what happens. We're dancing around the issue. But I think a soul who walked out of that room on October 28th, and this is Dr. Chong included, anticipated or thought that there was a binding, legally enforceable agreement at the conclusion of that meeting. Even Chong, yes, but disinterested Whitman said, as at that point, there was nothing more than an agreement to agree. Everybody knew leases had to be drafted. Everybody knew terms had to be ‑‑ Dr. Mortenstein testified at trial that in the exact departure meeting, he admitted that when he entered into the lease extension, he felt the rental rate for his lease was $27.71, and that amount included $11.21 that would be used to pay the first $11.21 in operating expenses. Chong testified to the exact same terms. So how can we say there was no agreement on terms? Where's this coming from? They both testified to the same thing. You see, you're talking about you were there. That's true, I was there. But isn't it true that there's more than one term on the lease? Don't we have more than just rent? Your argument is unless there's a ironclay agreement on all clauses, there could be no binding agreement on rent. Is that what you're saying? That's essentially what you're saying. There would be no binding agreement on rent here because you have ‑‑ What if she put in $6.50 instead of $16.50? That would be the bottom line. But the $6.50 was never represented in any prior writing. $16.50 is in the purchase proposal. It's in the contract of sale. You can see it repeatedly. And if you were correct, and she has to pay the operating expenses, everything that she's making, what, $6 per square foot? You saw Timothy Wagner tell you that the 1121 has got $4 to $4.40 a block. So that contention that she's only making $5 a square foot is not correct. I take it that that was probably something that was discussed during the hearing. We had a period where there were some attempts to renegotiate the lease. Is that what was going on? Mr. Elliott made some comment about that. I've been here since the beginning. I'm not aware of any attempt to renegotiate the lease. I mean, there were a couple of mediation sessions that were court ordered, but to my knowledge, there was no ‑‑ One of the major problems here is the noncompete clause, the relocation clause. The real issue before us is the amount of rent. And your position is it should have been $1,650 and it should have been $1,650. It's that way today. Dr. Miller, he sits there, we're on your file of the lease, and with three percent escalators, he's paying $19 a square foot. You say it's nowhere reflected in the agreement, the building agreement, so to speak. I'm looking at page A184 in the appendix. And it says rent shall be one of the following. It says annual rent shall be $2,771 for 10 years, $2,600. We don't know. Paragraph 8II. Right. And then in the III, the annual rent includes a base amount of $1,650. It goes on to explain. And then it says, for example, in year two, the comparative rental rate shall be calculated using the following terms. The base plus $1,121 PSA. It's there. It's in the document. It's not, as you said, it wasn't in the document. Well, there's convoluted language there, too. Well, it may be convoluted, but it's there. But Dr. Morgan, he didn't claim the contract. But someone on his behalf did. Well, the general partner did. Right. That is correct. Do you have any other questions? No. You have a brief moment, because then you have time for rebuttal again. Okay. Do I have an opportunity to touch on one more point? Because I really haven't touched on the Vander Molen memo, which dwells on the attorney-client privilege issue. We'll give you a couple minutes, please. All right. The Vander Molen memo of 9-20-2007 was the subject of a Green-Taylor briefing. Question one is, is this document privileged in any manner? Number two, was the privilege weighted? I think just a preliminary focus on Supreme Court Rule 201-B-2 says that a privileged document is one from an attorney to an attorney. This is neither. This document was not privileged in any sense of the word, even from the get-go, despite the fact that Stratford attempts to bring Mr. Vander Molen within the control group cases that are briefed. It is clear that Mr. Vander Molen was fired three weeks before he authored this document. The complaint, in this case, was filed three days before this document was authored. So this information was not to guide counsel in the preparation of a complaint. This information was not by a control group advisor. The existing cases say that if you're a member of a control group, in order to be privileged, the document, you either have to be a decision-maker or your advisory role has to be critical to the decision-making process. Let's kind of cut to the chase. If the document says, Dr. Truong, you've made a mistake, does that eliminate the fact that you're fired? Well, it doesn't eliminate my point at all, but I think it does two things. It shows the statement that we know you didn't understand the difference between a gross lease and a modified gross lease shows error of judgment. It shows a mistake of judgment, not a mistake of fact. Why is that not a mistake of fact? Because she did not understand the legal effect of the terms that she used to implement in the lease. That's why the memo is important. Also, it shows just the categorical falsity of the allegation of a typographical error. This was not a typographical error in any sense of the word. It was an understanding error, a decisional and judgmental error. That's why we believe that it was a key document that should have come in and should not have been printed. Also, on the waiver issue, keep in mind, number one, just like in Dalen v. Ozike, which is the controlling second district authority, I was invited to call Hendermon. I was given his phone number. I was not told in any way, shape, or form that, well, we have to see the documents first, we have to review them first. Later that afternoon, I got the phone number. I called Hendermon. There was no mistake as to who I was. I identified myself clearly from the get-go. I was offered the documents by e-mail. They were sent by e-mail. The same thing occurred in Dalen v. Ozike. Counsel invited my opposing counsel into his office, gave him full unrestricted access to the materials and the files, and the document was uncovered. It's a waiver. And lastly, word product cases are quite clear. You don't have a word product defense unless it's from an attorney. Vanderbilt is not an attorney. I know I've overdone my time. Thank you very much. Well, I assume by your coming forward you have something you want to say, Mr. Elliott. I have a few comments. I don't know how much time I have because I think I need some of it up before, so I'll try to be as brief as I can. Is that the order set? Yes. Okay. First, I think I misspoke earlier in Justice Burkett. You had asked me if we had a case where interest was awarded on unpaid rent on a reformed lease, and we do. It's Jones v. Parker from 1913 First District case. Where was it from? Well, both sides have given us that, and this may be a unique circumstance because some of these older cases may actually be relevant because that was back in the days when courts of equity sat separately from courts of law, and there was a lot more jurisprudence about what you can do and can't do, which brings me to my next point. We do have a Kelly v. Galbraith case. This one from the McKinley administration, 1900, tells us that a court of equity may also afford legal relief. Someone's over to you to go see the case. And, again, the language is may. It doesn't say shall. That's correct. Okay. May indicating a discretionary issue. That's true. Okay. That's true. I was trying to listen to the argument when Mr. Maloney was talking about the fee shift provision, $35,000, and what I think I heard him saying was that this court should take into account some measure of fault. If my client acted foolishly or made a mistake, maybe she wouldn't be entitled to take advantage of this particular provision. And I go back to the language of this paragraph, and the first portion of this mentions fault, but then the second sentence, which is the one we're seeking to seek fees under, recover fees under, has no provision for fault. It just simply says if there's an action to enforce the lease, and implied in that is if it's a successful action to enforce the lease, we're entitled to fees. So it's pretty clear that the provision here awards us fees and requires fees on a successful action to enforce the contract, which we think this was. We do think this is a de novo issue. I do recognize that if this court were to reverse it, we have to remand for some assessment of reasonableness of fees, and I think that the other considerations that have been articulated may come into play at that point, but it's clear in the face of the lease that fees in our view have to be removed. And why is this de novo? Because there's no disagreement concerning the facts? Well, he identified several. Well, it's a straight contract interpretation. The court here did not, in making its ruling, the court did not go into the facts of the case. The court simply said this provision applies to enforcement actions. Reformation is not an enforcement action. That's a straight analysis of law and interpretation of the contract, and we provide you with a law that says no, reformation actually is an enforcement mechanism. It certainly wasn't this case. They were compelled to obey the terms of a reformed lease. And if we remanded it, would we remand it also for determination by the trial court as to whether or not your client was somehow at fault for the litigation? I don't think on that issue. If you remanded it, you could remand it for potentially two issues. Number one would be determination as to who the prevailing party is. There was no determination of that below. I would submit that the record is clear enough that there would be potentially no need for remand on that issue. We're the only party with a real shot at claiming we're the prevailing party. We got what we wanted except for the fees and the interest. We got everything else that we wanted. They did not. Do we know who drafted the 1993 leases? They were drafted by the, my understanding is, by the law firm that represented the general partner, which was one of the central to pay agents at the time. Okay. And who drafted these leases in 2005? These leases were drafted by the Hufoma law firm, and the testimony is that what they did was they took the 93 lease, sat down and retyped it because they didn't have an electronic version of it, and then simply submitted it. So, contrary to Mr. Maloney's position, there were attorneys involved, maybe not soon enough, but there were attorneys involved. Well, I chuckle when he makes that argument because the truth of the matter is that when the parties were acting without attorneys in the fall of 2005, and my client didn't have an attorney and neither did his client, when they were acting without attorneys, they did a good job on agreeing to this. When both sides got attorneys involved is when it became a protracted process in the early part of 2006. And with respect to the merits of the reformation claim, Dr. Gordonstein's testimony is really the end of the argument that his lawyer presents here today because despite all the arguments about unclarity or concepts such as stop that are unclear or vague or perhaps there were disagreements, Dr. Morgenstein's own testimony is crystal clear. He understood the purchase proposal he got, which by the way does not mention the number 1650. He understood the purchase proposal he got in October 2007 required him to pay $27 in rent. He agreed to pay $27 in rent. There is some discussion when my opposing counsel is up here to the effect that, well, Dr. Morgenstein suspected that Dr. Schoen might want $27.71 in rent. That's testimony. His testimony is he agreed to pay that amount. There is, it does mention on the same page I was discussing before, A180-84. The annual rental rate includes a base amount of $1650 or $15. So it's mentioned. Well, we're talking about different documents. What I was referring to is the purchase proposal, which is page 161. Oh, I'm talking about the actual agreement that was done. I'm speaking, I apologize, Your Honor. I'm speaking about the actual handwritten document that was presented to Dr. Morgenstein in October, which is Before the general partner signed the contract for sale. Correct. Page 161 of our appendix. But Dr. Morgenstein testified he knew he'd have to pay $27 in October. There's an email exchange in December. He testified that he knew that as of December he had to pay $27 in rent. There's another email exchange in January of 2006. He testified he understood that to mean he had to pay $27 in rent. And, of course, he also testified that when he signed the lease, he knew he had to pay $27 in rent. There's never any testimony from Dr. Morgenstein to suggest that that was a moving target or was contingent upon other factors or that he ever backed away from him. So his testimony is really the end of the story we would submit on that. So this document that is wrongly characterized as privilege, per Mr. Morgenstein's argument, that she made a mistake in judgment, if that is a mistake in judgment, is that trumped by Dr. Morgenstein's admission? I'm unclear on what the mistake of judgment was that he was stating. There was, at trial, there was an effort by Dr. Morgenstein to try and pin the blame. You know, was it Huck Boma that made the mistake? Was it Dr. Chong? Was it both? We submitted, and I think the circuit court agreed, it didn't really matter who specifically on our side of the equation was the person who put the numbers in. The fact of the matter is that everybody saw the leases, everybody touched the leases, and the lawyers on both sides declined. Nobody noticed this particular provision. Everybody thought at the time it was signed it was $27. So I'm not, I guess I'm not crystal clear on what the mistake in judgment was. Well, apparently it's between a gross lease and a, I can't remember the other term now. Thank you. Different types of leases, and we didn't have a pass-through claim, we had a stop claim, or a stop paragraph. That was never the discussion. I mean, with respect, that's a lawyer's argument that's trying to be superimposed on what the business people here actually said and thought. But at the time she didn't have a lawyer when she was proposing the real estate sale. Right, which is critical that, which is why it's critical that both parties agree that they understood what the rental obligation was. It didn't turn on terms such as stop or gross lease or modified gross. Those terms didn't come into the equation. Nobody knew what the dollar was. All right, so you're saying it's on your position on the privilege issue. If he didn't have to travel over there and pursuing it in its privilege, it would be in what we call harmless error in light of the clear and consistent testimony of Dr. Morgan. I think that's half of it. And also the testimony of Ed Vandenborn. He was there. They cross-examined him. He got his story out. There's no showing that if they cross-examined him in this document, it would have somehow interacted with everything else. I also firmly believe that the document is and was privileged. On the Dolan case, which counsel cited and said it was just like that, it's actually not. In the Dolan case, one of the party's lawyers invited the other lawyer to just come into his office and review documents without any sort of previous review. That was extraordinarily careless. In this particular instance, Mr. Vandenborn is a third-party witness. We had called him in advance and said, you've got a subpoena. We believe that documents you may have may be privileged. We would like to review them first. He agreed to that. His assistant, Ms. Whitkey, then made a mistake. And she has an affidavit in the record on this. She got a call from Mr. Maloney. She got confused, thought Mr. Maloney was us, and forwarded the documents to him, thinking she was forwarding them to us. That's her testimony in the record. We found out about that within 24, 48 hours. We immediately demanded their return. So this wasn't a case where we said, yeah, just go over and look at Vandenborn's records, do whatever you want. It never happened. Oh, you demanded their return because you hadn't seen them yet. It wasn't because they were privileged, per se, at the time you demanded their return. That's correct. We needed to make a privilege assessment, and there was extensive briefing in the circuit court on this. They included the documents, by the way. That's correct. That's correct. And we had to continue with final motions to get them put back under speed in order to have them redacted out of the record. So once we examined them, we declared a privilege on them. There's another round of briefing, which I quote, for example, that they were privileged. I believe this court has the document, and I would submit that there is no way that you can look at that document and not think it was prepared with the mindset of assisting counsel in connection with ongoing litigation. But it was addressed to counsel. It was addressed to Dr. Chong. It was addressed to Dr. Chong. We know she's not an attorney. She is clearly not an attorney. It is definitely a work product, though, because they were seeking to provide advice on the complaint that we had prepared. She had been asked to forward it to him for his review. Now, he didn't get around to reviewing it until three days after the complaint was filed. I don't think he knew of the complaint that had been filed at that point, so the timing is unfortunate. But in sum, we think it's privileged, but we also think it's a non-issue. That document was not going to unravel the other testimony in the case. I do want to, I think, follow up on one other argument that counsel made, which is he invoked the statute of frauds, the integration provisions that are in the contract, the plural evidence rule. The case law is pretty clear. None of those are applicable in a reformation action because we're not trying to enforce a stand-alone oral agreement. We're trying to enforce a written contract, but simply saying that one of the terms of the written contract is wrong. And based on the court's questions to my opposing counsel, I think the court's well acquainted with that rule. I don't believe I have anything else unless the court has any additional questions it wants to ask. Okay. Thank you, counsel. Thank you. All right, Mr. Mullen, since you did not return to, well, his issues particularly, let's talk about yours because I think that's where we're going. Okay. Just to add a little to my former comments without repeating, on the subject of attorney's fees and the fact that there were controverted facts, which required discretion by the trial court to apply to the fee clause, not only was the cause of litigation a contested fact, whether this was an arm's-length transaction or one under compulsion was a contested matter of fact. Who was the prevailing party? Keep in mind, the defendant defeated this reformation claim for 57 of the 84 months of this seven-year lease. My math says that's 68% of the relief requested. And this is unlike a tort claim where somebody asks for the sky and hopes to get two-thirds or half of the sky. We had to offer substantive evidence to persuade the trial court that this lease was terminated, a notice of termination of leasehold, testimony surrounding it. So both parties achieved substantial benefit. I don't think it can be said that either side is a prevailing party. Also, on the subject of attorney's fees, I would suggest, I believe it's the Rockford-Statenville case, says that declaratory judgment actions are not appropriate for attorney's fees. And a reformation action is a little bit like a declaratory judgment action. And it's like a declaratory judgment action because you're asking the trial court to declare and determine. Is there a mistake of fact or is there a mistake of law? Is it unilateral? Is it mutual? Is there a binding antecedent agreement which can be reformed? Or is it too vague and nebulous to base any type of reformation? So all of these preliminary determinations strongly suggest that the very reasoning used for declaratory judgment action should be used for this action as well. But all of those, I think all of those answers were answered against your client in essence, those three that you just put to us now. You're talking about prevailing party? Well, those are the three you just put. Mutual, fact, and, oh, I can't remember the third one. Yes, yes. Related to Rick Perry. I'm going to break him on my fingers. But I'm just saying this is an additional consideration because, really, this is not asking for a monetary award for a breach in an express lease term. Also, counsel mentioned that, really, the parties were getting along pretty well until attorneys became involved. I was taken a little bit aback by the comment because I specifically recall the series of e-mails, which I hope you noticed, from April to June, back and forth, let's get down, let's have a negotiating process. Even independent witness John Yip was trying to act as a mediator. Please, let's get together, get these issues resolved. Dr. John stonewalling the whole thing. Attorneys weren't involved in that. The doctors were trying to precipitate a meeting here. This lease was her way or the highway. Again, the court places great emphasis on Dr. Norgenstein's testimony that at the time he signed, he expected to and agreed with 2771. But none of his other terms and conditions were met. He signed under compulsion and duress. He didn't want this lease at 1650 or 2771. And when he saw this first available opportunity at month 27, he exited. This was not the result of arm's length clarity. Regarding your comments as to whether this was a mistake of law or a mistake of fact, quite simply put, Dr. Charn did not understand that the use of the term stop in commercial leasing means and imposes a landlord obligation. It's as simple as that. She didn't understand the meaning of that. That is why it is a mistake of law, a mistake of decisional judgment. On the subject of the Vanderhorn memo, keep in mind, at the get-go of this case, our very first Rule 214 request to produce requested all Vanderhorn documents. We didn't get it. When the documents surfaced, I believe it was on June 10 of 08, when the documents surfaced, Stratford had filed not one but two privilege laws. It was on neither. This is a document that was sent to Dr. Charn. It didn't appear. It wasn't on the April privilege law. It wasn't on the June privilege law. How is it not late? Finally, on the subject of work product, Dayland is the controlling second district authority. If you're going to have a work product privilege, it must be offered by an attorney. No exceptions. Vanderhorn is not an exception. Statute of frauds, I know there are cases. There's a court. There's a court. And a reformation action can look beyond the statute of frauds and examine the mistake. My point was that if you're going to determine that there's a binding antecedent agreement, you should withhold muster under the statute of frauds, either under the provision that it's an agreement not to be reformed within a year or it involves an interest in real estate. Thank you very much. Appreciate it. All right, we will take this matter under guidance. We will issue a decision in due course, and we now do stand adjourned.